UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RIVERDEEP INC., A LIMITED LIABILITY COMPANY, <br><br> Plaintiff, <br><br> vs. <br><br> SOMC GROUP, INC., a California corporation; LOGETICS, INC., a California corporation; SAN DIEGO CREDIT ASSOCIATION, a California corporation; READY, SET, GROW!, a California corporation; JELLY BEAN ISLANDS, a California corporation; and LEAP AHEAD, a California corporation, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. 05-10816 REK

AFFIDAVIT OF IRWIN B. SCHWARTZ
IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS

Irwin B. Schwartz hereby declares as follows:

1.　　I am an attorney duly admitted in the Commonwealth of Massachusetts and this Court and a member of the law firm Petrie Schwartz LLP. My firm is counsel to Plaintiff Riverdeep, Inc., LLC ("Riverdeep"). I respectfully submit this affidavit in support of Riverdeep's Opposition to the Motion to Dismiss of Defendant San Diego Wholesale Credit Association ("SDWCA").

2.　　On May 17, 2005, Riverdeep filed a First Amended Complaint ("Amended Complaint").

3.　　The Amended Complaint references three agreements that SDWCA relies upon in support of its motion to dismiss.

4.      Amended Complaint ¶ 1 references the OEM License Agreement between Riverdeep on the one hand and SOMC Group, Inc. ("SOMC") and Logetics, Inc. ("Logetics") on the other hand (the "2002 Agreement"). I attach a true and correct copy of excerpts from the 2002 Agreement at Tab 1.

5.      Amended Complaint ¶ 28 references a General Assignment agreement by which SOMC's purportedly assigned all its assets to SDWCA for the benefit of SOMC's creditors. I attach a true and correct copy of the General Assignment at Tab 2.

6.      Amended Complaint ¶ 29 references an Asset Purchase Agreement by which SDWCA sold SOMC's assets to Logetics. I attach a true and correct copy of the Asset Purchase Agreement at Tab 3.

SWORN AND SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 17th DAY OF JUNE, 2005.

Irwin B. Schwartz

2

Tab 1

## OEM LICENSE AGREEMENT
(Manufacturing Rights)

This OEM License Agreement (this "**Agreement**") is entered into as of March 28, 2002 (the "**Effective Date**") by and between Broderbund LLC, a Minnesota company ("**Broderbund**") and the companies identified below (collectively, "**OEM**").

WHEREAS, Broderbund publishes, markets and distributes the one or more computer software products listed on <u>Exhibit A</u> (the "Products"); and

WHEREAS, OEM desires to obtain a license to manufacture, market and distribute the Products to its customers subject to the restrictions identified on <u>Exhibit A</u>.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Broderbund and OEM do hereby agree to the terms and conditions set forth herein and in the attached <u>Exhibit A</u>, <u>Exhibit B</u> and <u>Exhibit C</u>, the provisions of which are incorporated herein by this reference.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed under seal as of the Effective Date

| Broderbund LLC | SOMC Group, Inc. ("SOMC") |
|---|---|
| By: _John Bartlett_ <br> John Bartlett <br> Vice President, OEM Sales | By: _Thomas E. Holland_ <br> Thomas E. Holland <br> President |

_3/28/01_

*This document does not constitute an offer or any form of an agreement until it is approved and signed by Broderbund. It is submitted to OEM for discussion purposes only.*

Broderbund LLC
500 Redwood Blvd
Novato, CA 94947
Attn: Chief Financial Officer
Tel: (415) 382-4400
Fax: (415) 382-4411

With a copy to:

Broderbund LLC
500 Redwood Blvd
Novato, CA 94947
Attn: General Counsel
Tel: (415) 382-4400
Fax: (415) 382-4411

SOMC Group, Inc.
1935 Camino Vida Roble
Carlsbad, CA 92008
Tel: (760) 827-7378
Fax: (760) 827-4202

Logetics, Inc ("Logetics")

By: _____
    Thomas E. Holland,
    President

Logetics, Inc.
1935 Camino Vida Roble
Carlsbad, CA 92008
Tel: (760) 942-7000
Fax: (760)

**(Agreement continues on following page)**

//
//
//

*This document does not constitute an offer or any form of an agreement until it is approved and signed by Broderbund It is submitted to OEM for discussion purposes only*

- 2 -

**EXHIBIT A**

## THE PRODUCTS

1.    Products

(a)    <u>SOMC/LOGETICS CLUB PRODUCTS</u>  Products that may be distributed as part of the SOMC and/or Logetics branded club described in Section 2(b) below ("SOMC/Logetics Club Products")

| Product(s) | Version/SKU | Per Unit License Fee |
|---|---|---|
| Amazon Trail 3rd Ed: Rainforest Adventures | AMA3744AE | $0.65 |
| Bob Vila's Home Design | BVH3844AE | $0.85 |
| Carmen Sandiego Junior Detective | 51406 | $0.65 |
| Carmen Sandiego Math Detective | 25701 | $0.65 |
| Carmen Sandiego Word Detective | 45820 | $0.65 |
| Carmen Sandiego's Great Chase Through Time, CD1 | CST3744AE | $0.85 |
| Carmen Sandiego's ThinkQuick Challenge | CSQ3744AE | $0.85 |
| Children's Bible Stories | CBS3544AE | $0.65 |
| Compton's 3D World Atlas | CWA844AE-CD1 | $0.65 |
| Compton's Home Library Battles of the World | BTF3744AE | $0.65 |
| Compton's Interactive Bible – NIV | 113069 | $0.65 |
| Daniel in the Lion's Den | 48501 | $0.85 |
| Explorers of the New World | EXP2544AE | $0.65 |
| French to Go | PFR3844AE | $0.85 |
| Just Grandma and Me | 48462 | $0.85 |
| Kid Pix Studio Deluxe | 28537 | $0.85 |
| Knowledge Munchers Deluxe | KMC2744AE-D&D | $0.85 |
| Leap Ahead! 1st Grade | | $0.85 |
| Leap Ahead! 2nd Grade | | $0.85 |
| Leap Ahead! 3rd Grade | | $0.85 |
| Leap Ahead! Kindergarten | | $0.85 |
| Leap Ahead! Math 6-9 | | $0.85 |
| Leap Ahead! Phonics | | $0.85 |
| Leap Ahead! Preschool | | $0.85 |
| Leap Ahead! Reading 6-11 | | $0.85 |
| Learn to Speak English 8.0 | LTSE3544DE | $0.85 |
| Learn to Speak English from Spanish (Hablemos Ingles) 7.0 | LTSH6544CE | $0.85 |
| Learn to Speak French 8.0 | LSF3744DE | $0.85 |
| Learn to Speak German 8.0 | LTSG3544DE | $0.85 |

*This document does not constitute an offer or any form of an agreement until it is approved and signed by Broderbund. It is submitted to OEM for discussion purposes only.*

| | | |
|---|---|---|
| Little Bear Preschool Thinking Adventures | 379655 | $0.75 |
| Little Bear Toddler Discovery Adventures | 379737 | $0.75 |
| Oregon Trail II | OTT3744AE | $0.65 |
| Practice Makes Perfect French | PMPF3544AE | $0.75 |
| Practice Makes Perfect Spanish | PMPS3544AE | $0.75 |
| Reader Rabbit Toddler | RRT3744CE | $0.65 |
| Reader Rabbit Reading Ages 4-6 | 378474 | $0.65 |
| Schoolhouse Rock Grammar Rock | SGR3744ae | $0.85 |
| Schoolhouse Rock Math Rock | 21010-D&D | $0.85 |
| Schoolhouse Rock Thinking Games | BBT3844AE | $0.85 |
| Ultimate Children's Encylcopedia | ZCE3544AE | $0.85 |
| Ultimate Writing & Creativity Center | UWC54EE-CD | $0.85 |
| Where in the USA in Carmen Sandiego | CSU3744AE | $0.85 |
| Reader Rabbit Toddler | RRT3744CE | $0.65 |
| Reader Rabbit Preschool | RRP3477BE | $0.65 |
| SchoolHouse Rock Thinking Games | BBT3844AE | $0.85 |
| SchoolHouse Rock Grammar Rock | SGR3744AE | $0.85 |
| SchoolHouse Rock Math Rock | 21010-D&D | $0.85 |
| Theme Weavers: Animals | | $0.75 |
| Thinkin Things All Around Fripple Town | | $0.75 |
| Thinkin Things Collection 1 | | $0.75 |
| Thinkin Things Galactic Brain Benders | | $0.75 |
| Stanley's Sticker Stories | | $0.75 |
| Let's Go Read! 1: An Island Adventure | | $0.75 |
| Mighty Math Carnival Countdown | | $0.75 |
| Mighty Math Astro Algebra | | $0.75 |
| Talking Walls | | $0.75 |

(b)    BRODERBUND/TLC CLUB PRODUCTS.  Products that may be distributed through the Broderbund/TLC co-branded club described in Section 2(b) below ("Broderbund/TLC Club Products")

Same as 1(a) above

Products that may be distributed as "lead generators" to acquire potential customers for the Broderbund/TLC co-branded club described in Section 2(b) below but do not require membership by the potential customer.

Same 1(b) above

2.    **Authorized Channels** are defined as:

(a)    Authorized Product and Bundle Configurations.  OEM may only distribute the Products in the following designated manner (please check appropriate boxes):

*This document does not constitute an offer or any form of an agreement until it is approved and signed by Broderbund.  It is submitted to OEM for discussion purposes only.*

☐ Hardware bundle. The Products will always be bundled with a computer-related hardware product of OEM with a suggested retail price of $50 or more, as part of a single contemporaneous sale.

☐ Aftermarket hardware sale. The Products may only be sold to a registered customer that has recently purchased, within ninety (90) days, one of OEM's hardware products with a suggested retail price of $250 or more.

☐ Soft bundle

☐ Magazine cover mount.

☐ Packaging restrictions: Products may only be sold in:

   ☐ Paper wrap

   ☐ Jewel case

   ☐ Mini box/DVD packaging (not to exceed 5"x7"x1.5")

☒ Other: The Products shall only be distributed by OEM either as (1) a lead generator as a single unit or bundled with other software products, or (2) as part of a club as a SOMC/Logetics or TLC/Broderbund branded club offering

(b)    Authorized Channels. In addition to the foregoing restrictions, OEM may only distribute the Products in the following channels (please check appropriate boxes):

☐ Gift Shops

☐ Drug Store

☐ Direct to Consumer (catalog sales only)

☐ Direct to Consumer (outbound emails only)

☐ Direct to Consumer (outbound telemarketing only)

☐ Department Store (including, for example: Macy's, Bloomingdale's, etc.)

☐ Mid-Tier Store (including, for example: JCPenny, Sears, Montgomery Ward's, etc.)

☐ Superstore (including, for example: CompUSA, Best Buy, Circuit City, Fry's, etc.)

☐ Office Outlet (including, for example: Staples, Office Depot, Office Max, etc.)

☐ Specialty Mall (including, for example: Electronics Boutique, Babbages, Musicland, etc.)

☐ Toy (including, for example: Toys r' Us, Kaybee, etc.)

☐ Mass Market (including, for example: Target, Wal-mart, KMart, etc.)

☐ Supermarket

☐ Book Club

☐ Warehouse Club (including, for example: BJ's, Costco, Sam's, etc.)

☐ E-commerce Sales (orders taken from website, www._____.com. No such right exists if the foregoing blank is not filled )

☒ Other: OEM may distribute the SOMC/Logetics Club Products to end user customers as part of its SOMC/Logetics or TLC/Broderbund branded club membership only in which SOMC/Logetics club members pay the established membership fee (to be approved by Broderbund, not to be unreasonably withheld) and, in exchange, receive one title per month until they decide to unsubscribe (or two titles per month if the club members pay the established membership fee to be approved by Broderbund, not to be unreasonably withheld).

SOMC and/or Logetics may distribute to end user customers the SOMC/Logetics Club Products and TLC/Broderbund branded Club Products identified in Section 1(b) as part of

*This document does not constitute an offer or any form of an agreement until it is approved and signed by Broderbund. It is submitted to OEM for discussion purposes only*

outbound telemarketing, FSI ("Free Standing Inserts"), emails and direct mails in which the Products are offered on a promotional basis such as for free to customers (customer pays shipping and handling), discounted price (with no charge for shipping and handling), discounted price plus customer pays shipping and handling, or any combination thereof, as a means of generating potential SOMC/Logetics Club customers. SOMC and/or Logetics will provide all promotional materials, telemarketing scripts, inserts, emails, direct mails and any other marketing collateral relating to the SOMC/Logetics Club or TLC/Broderbund Club for approval prior to its use. Broderbund may withhold approval of any materials, not to be unreasonably withheld.

(c)    Agreements with Third Parties. Subject to Broderbund's prior written consent, to be granted at its sole discretion, SOMC and Logetics may each enter into agreements with third parties to create private label software clubs similar to the SOMC/Logetics club under which third parties would distribute the SOMC/Logetics Club Products and/or the Broderbund/TLC Club Products. SOMC and/or Logetics will ensure that any third party that distributes the SOMC/Logetics or Broderbund/TLC Products will provide all promotional materials, telemarketing scripts, inserts, emails, direct mails and any other marketing collateral relating to Broderbund for approval prior to its use, not to be unreasonably withheld . SOMC and Logetics shall remaining solely liable for any failure of the third party to provide such materials for review prior to use.

3.    Licensed Media:  CD-ROM only.

4.    License Fees, Reports and Payment:

(a)    Guaranteed License Fee.  Notwithstanding any other provisions in this Agreement, OEM shall pay to Broderbund the following non-refundable, irrevocable, non-transferable license fees, totaling **U.S. $$1,500,000 dollars** which shall be paid on the following dates:

| June 30, 2002 | $300,000 |
|---|---|
| September 30, 2002 | $300,000 |
| December 30, 2002 | $300,000 |
| March 30, 2003 | $600,000 |
|  |  |
|  |  |
| Total: | $1,500,000 |

(b)    Per Unit License Fees.  The per unit license fees identified in the above Section 1, and the Club Royalty identified in Section 4(c) below, as well any royalties earned and due to Broderbund, after March 31, 2002, under the Software License and Reproduction Agreement dated May 5, 1998 between SOMC Group, Inc. and Broderbund LLC, shall be applied against the applicable Guaranteed License Fee with respect to each unit of Product manufactured by OEM during the quarter ending on such date. If there is no Guaranteed License Fee, or once the Guaranteed License Fee has been earned down and recouped by OEM, then OEM shall pay directly to Broderbund the Per Unit License Fees listed in the above Section 1 for every unit it manufactures and any Club Royalty earned by Broderbund.

*This document does not constitute an offer or any form of an agreement until it is approved and signed by Broderbund It is submitted to OEM for discussion purposes only*

**EXHIBIT B**
**TERMS AND CONDITIONS**

1.    DEFINITIONS

1.1    **"Authorized Channels"** shall mean the specific authorized product and bundle configurations and the specific authorized channels identified in Section 2 of Exhibit A.

1.2    **"Confidential Information"** shall mean that information that is identified in Section 9.1 of this Exhibit B.

1.3    **"Cost of Goods"** shall mean all direct costs and expenses associated with the manufacture and delivery of the Products, including, without limitation, CD-ROMs, external and internal packaging, documentation, inserts, assembly, warehousing and manufacturing and licensing fees due to third parties relating to the Broderbund/TLC Club. This shall not include any allocation for employees, overhead or other indirect costs associate with the manufacture and delivery of the Products.

1.4    **"Expiration Date"** shall mean that specific date that is identified in Section 10 of Exhibit A.

1.5    **"Guaranteed License Fees"** shall mean the license fees payable to Broderbund in Section 4(a) of Exhibit A.

1.6    **"Licensed Media"** shall mean the specific licensed media identified in Section 3 of Exhibit A.

1.7    **"Net Receipts"** shall mean the gross revenues actually received by OEM less actual out of pocket costs directly related to the gross revenues from Cost of Goods, the Per Unit License Fees paid to Broderbund under this Agreement, licensing fees paid to third parties related to the Broderbund/TLC Club, sales taxes collected and refunds, actual direct third party marketing expenses directly relating to the Broderbund/TLC Branded Clubs, and all fees paid to Broderbund under the Letter Agreement dated March 29, 2002 between the parties and administrative costs directly related to the

Broderbund/TLC Club (such administrative costs can include commercially reasonable allocations of salaries and overhead, in the aggregate such administrative costs shall not to exceed 28% of gross revenues).

1.8    **"Per Unit License Fees"** shall mean the individual Product license fees of the respective Products identified in Section 1 of Exhibit A.

1.9    **"Product"** or **"Products"** shall mean those specific computer software products of TLC identified in Section 1 of Exhibit A. Where the term "SOMC Club Products" or "Broderbund Club Products" is used, the term shall have the specific meaning attributed in Exhibit A. All other use of the term Product shall include "SOMC Club Products" or "Broderbund Club Products."

1.10    **"Term"** shall mean that period of time that is identified in Section 5 of this Exhibit B.

1.11    **"Territory"** shall mean the specific geographic areas described in Section 5 of Exhibit A.

2.    GRANT OF LICENSE, RESTRICTIONS, DOCUMENTATION AND SUPPORT.

2.1    Rights Granted to OEM

(a)    Subject to this Agreement, Broderbund grants to OEM a non-transferable and non-exclusive license to manufacture, market and distribute the Products in the Licensed Media throughout the Territory for the Term of this Agreement, in the Authorized Channels.

(b)    OEM UNDERSTANDS AND AGREES THAT UNDER NO CIRCUMSTANCES WILL OEM DISTRIBUTE ANY PRODUCT OUTSIDE THE AUTHORIZED CHANNELS. SUCH AN ACT ON THE PART OF OEM SHALL

*This document does not constitute an offer or any form of an agreement until it is approved and signed by Broderbund. It is submitted to OEM for discussion purposes only*

- 13 -

CONSTITUTE A MATERIAL BREACH OF THIS AGREEMENT.

2.2    End-User License Agreement. OEM will not distribute any Product unless the Product is accompanied by Broderbund's standard form of end-user license agreement (as provided by Broderbund) as the same may be revised from time to time upon notice to OEM.

3.    COPYRIGHT AND TRADEMARK NOTICES AND TITLE.

3.1    Copyrights and Trademark. Broderbund hereby grants to OEM a non-exclusive, non-transferable right to use the names of the Products listed on Exhibit A when used in connection with the name **"Broderbund," and "The Learning Company,"** on copies of the Products licensed to OEM pursuant to and for the Term of this Agreement. Any sale of a Product or documentation (or any portion thereof) shall include the copyright, trademark and other proprietary rights notices as are currently contained on each such Product (or documentation) or may be specified from time to time by Broderbund. OEM will not challenge any intellectual property rights claimed by Broderbund in such trademarks.

3.2    Title to Products. Title to the Products shall not pass from Broderbund to OEM or its end-users, and the Products and all master copies thereof shall at all times remain the sole and exclusive property of Broderbund.

4    LICENSE FEES

OEM shall pay Broderbund the license fee(s) set forth on Exhibit A of this Agreement according to the terms set forth on Exhibit A.

5    TERM OF AGREEMENT.

Unless otherwise terminated earlier in accordance with the terms of this Agreement, the term of this Agreement shall continue from the Effective Date until the Expiration Date (the "**Term**"). This Agreement may thereafter only be

renewed for successive one-year periods upon the written amendment to this Agreement.

6.    TERMINATION AND BREACH.

6.1    Termination. Either party may terminate this Agreement, effective immediately upon written notice, under the following circumstances:

(a)    Except as provided for in Section 6.2, below, if either party materially breaches any provision of this Agreement and such breach has not been cured within thirty (30) days after the other party has given written notice of such breach, the non-breaching party may terminate this Agreement.

(b)    If, at any time, the Guaranteed License Fees or any other amounts due under this Agreement are not paid when due, at Broderbund's option, it may at any time during the Term of this Agreement upon not less than ten (10) days' prior written notice and failure to cure. Should the Agreement terminate pursuant to this provision, all Guaranteed License Fees shall be accelerated and due immediately.

(c)    If OEM should: (1) admit in writing its inability to pay its debts generally as they become due; (2) make a general assignment for the benefit of creditors; (3) institute proceedings to be adjudicated a voluntary bankrupt or consent to the filing of a petition of bankruptcy against it; (4) be adjudicated by a court of competent jurisdiction as being bankrupt or insolvent; (5) seek reorganization under any bankruptcy act, or consent to the filing of a petition seeking such reorganization; or (6) have a decree entered against it by a court of competent jurisdiction appointing a receiver, liquidator, trustee or assignee in bankruptcy or insolvency covering all or substantially all of such party's property or providing for the liquidation of such party's property or business affairs, and fail to cause the same to be removed within sixty (60) days, Broderbund may terminate this Agreement.

*This document does not constitute an offer or any form of an agreement until it is approved and signed by Broderbund. It is submitted to OEM for discussion purposes only.*

6.2   Termination for Violation of Authorized Channels  In the event that OEM or its customers (including resellers) violate Section 2 of Exhibit A, or otherwise make any improper use, transfer, duplication or disclosure of any of the Product(s), this Agreement and all of OEM's rights hereunder shall terminate immediately

6.3   Effect of Termination.  Upon the expiration or termination of this Agreement, the license granted hereunder shall terminate, and OEM shall immediately discontinue the manufacture of any Products; provided however, OEM shall have the right to sell off any remaining inventory in existence for a period of one hundred eighty (180) days, unless the Agreement has been terminated under Section 6.1 or Section 6.2, above.  In the final thirty days of the Term, OEM shall not manufacture Product in excess of the average number of units of Product manufactured during the Term.  All proprietary and confidential information shall be promptly returned to Broderbund.  Termination or expiration of this Agreement shall not relieve OEM of any of its payment obligations.

6.4   Survival of Certain Conditions.  Notwithstanding anything to the contrary contained in this Agreement, Sections 2.1(b), 2.2-2.5, 3.2, 4, 6.4, 7, 9 and 10 shall in all cases survive any expiration or termination of this Agreement.

6.5   Injunctive Relief  OEM understands and agrees that Broderbund will suffer irreparable harm in the event that OEM fails to comply with the any of its obligations under Section 2.1(b) above, and that monetary damages in such event would be substantial and inadequate to compensate Broderbund.  Consequently, in such event Broderbund will be entitled, in addition to such monetary relief as may be recoverable by law, to such temporary, preliminary and/or permanent injunctive relief as may be necessary to restrain any continuing or further breach by OEM, without showing or proving any actual damages sustained by Broderbund

7   REPRESENTATIONS, WARRANTIES AND INDEMNIFICATION

7.1   Broderbund's Representations and Warranties.  Broderbund represents and warrants to OEM the following:

(a)   Broderbund either owns all right, title and interest in the Products or possesses the necessary rights to grant OEM the rights and license granted hereunder.

(b)   Broderbund has the full power and authority to enter into this Agreement and to fulfill its obligations hereunder.

(c)   The Products do not infringe upon any intellectual property rights or other proprietary rights of any third party.

7.2   OEM's Representations and Warranties:  OEM represents and warrants to Broderbund the following:

(a)   OEM possesses full power and authority to enter into this Agreement and to fulfill its obligations hereunder; and

(b)   OEM's performance of the terms of this Agreement and of OEM's obligations hereunder shall not breach any separate agreement by which OEM is bound.

7.3   Broderbund Indemnities.  Broderbund agrees to indemnify, hold harmless and defend OEM from all claims, liabilities, damages, defense costs (including reasonable attorneys' fees), judgments and other expenses arising out of or on account of the breach of any of its covenants, representations or warranties set forth in this Agreement.

7.4   OEM Indemnities.  OEM agrees to indemnify, hold harmless and defend Broderbund from all claims, liabilities, damages, defense costs (including reasonable attorneys' fees), judgments and other expenses arising out of or on account of the breach of any of its covenants, representations or warranties set forth in this Agreement.

*This document does not constitute an offer or any form of an agreement until it is approved and signed by Broderbund  It is submitted to OEM for discussion purposes only.*

(ii) is lawfully received from third parties subject to no restriction of confidentiality, (iii) can be shown by the receiving party to have been independently developed by it, (iv) is disclosed by the disclosing party to third parties without restriction on subsequent disclosure, or (v) is required to be disclosed in the context of an administrative or judicial proceeding, except that in such case the receiving party agrees to provide the disclosing party with prompt notice of such requirement in order to allow the disclosing party to seek an appropriate protective order.

9.3    Term of Confidentiality. Each party's obligations under this Section 9 shall survive the termination or expiration of this Agreement for a period of two (2) years.

10    MISCELLANEOUS PROVISIONS.

10.1    Entire Agreement. This Agreement, including all Exhibits, contains the entire understanding of the parties hereto relating to the Products, supersedes any prior written or oral agreement or understandings between the parties with respect to the Products, and cannot be changed or terminated orally. This Agreement may be amended only by a writing signed by the parties hereto.

10.2    Enforceability. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement.

10.3    Assignment. Neither this Agreement nor the rights or obligations hereunder may be assigned by OEM without the prior written consent of Broderbund, which consent shall not be unreasonably withheld; provided however, that OEM may assign this Agreement upon the merger of OEM or the sale of OEM's business, all without the consent of Broderbund, if OEM gives notice to Broderbund of such assignment. In the event of such an assignment, this Agreement shall be binding upon such successors and assignees.

In the event that Broderbund sells substantially all of the assets of any of its business units by sale, merger, or otherwise, then, Broderbund may elect to assign the duties and obligations arising under this Agreement with respect to such transferred business or assets to the purchaser of such business or assets to the extent such sale relates to the Products. In such event, Broderbund may elect to require OEM to enter into a substantially identical agreement to this Agreement for the transferred Products.

10.4    Independent Contractors. OEM and Broderbund shall perform their duties pursuant to this Agreement as independent contractors. Nothing in this Agreement shall be construed to create a joint venture, partnership or other joint relationship between OEM and Broderbund. Neither party shall have the ability to incur any obligation on behalf of the other party.

10.5    Successors. Subject to Section 10.3 above, all rights and obligations arising out of this Agreement shall inure to the benefit of, and be binding on and enforceable by the parties and their respective successors and permitted assigns.

10.6    Currency. All dollar amounts herein are expressed in United States funds.

10.7    Governing Law. This Agreement and its validity, construction and performance shall be governed in all respects by the laws of the Commonwealth of Massachusetts and all claims and/or lawsuits in connection with this Agreement must be brought in a court of competent jurisdiction within Massachusetts.

10.8    Notices. All notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given or made if hand delivered, mailed first class mail, postage prepaid, sent by prepaid telegram (or telex or other facsimile transmission) or sent by express overnight courier service to the address listed above or to such other address as any such party may have

*This document does not constitute an offer or any form of an agreement until it is approved and signed by Broderbund. It is submitted to OEM for discussion purposes only.*

- 17 -

### AMENDMENT NO. 1 TO
### OEM LICENSE AGREEMENT

This Amendment No. 1 (this "**Amendment**") shall serve to amend as of December 30, 2002, that certain OEM License Agreement dated March 28, 2002 by and between Broderbund LLC ("**Broderbund**"), and SOMC Group, INC ("**OEM**"), (the "**Agreement**").

The parties hereby agree as follows:

1.        The program(s) listed on Schedule A-1 attached hereto are hereby added to Sections 1 (a) and 1 (b) Schedule A of the Agreement and shall be subject to all of the terms and conditions set forth in the Agreement and each such program shall be deemed to be a "**Product**" for the purposes of the Agreement.

2

Guaranteed License Fee.  Notwithstanding any other provisions in the Agreement, OEM shall pay to Broderbund the following additional, non-refundable, irrevocable, non-transferable license fees, totaling U.S. **$800,0000** dollars (collectively, the "**Guaranteed License Fees**", and, individually, each a "**Guaranteed License Fee**").  Any payments made shall be applied against the guarantee license fee. Payments will be made by April 30, July 15, October 15, and December 30.  Such amounts will be not be less than $200,000 and in no event will the cumulative amount paid by December 30, 2003 be less than the total Guaranteed License Fees under this Agreement   .

3.        Per Unit License Fees.  Distributor shall pay the Per Unit License Fees for the Products sold, but no event less than the Guaranteed License Fees described above, under this Amendment as described.

4.        Assignment.  By way of this Amendment, Broderbund LLC hereby assigns to Riverdeep, Inc., all of its rights and obligations under the Agreement, and SOMC Group, Inc. consents to and Riverdeep, Inc. hereby accepts such an assignment.

5.        This Amendment constitutes the entire agreement of the parties and supersedes any and all prior and contemporaneous oral and/or written agreements concerning the subject matter hereof.  Except as specifically modified herein, all terms and provisions of the Agreement remain in full force and effect This Amendment shall be governed as a sealed instrument under California law.  Capitalized terms used in this Amendment and not defined herein shall have the same meaning as set forth in the Agreement.

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be signed under seal as of the date first set forth above.

BRODERBUND LLC                          SOMC GROUP, INC.

By:_____            By: _____
     Name:                                   Name: _Thomas E. Holland_
     Title:                                  Title: _President & CEO_

RIVERDEEP, INC                          LOGETICS, INC.

By:_____            By: _____
     Name:                                   Name: _Thomas E. Holland_
     Title:                                  Title: _President & CEO_

1

Tab 2

# GENERAL ASSIGNMENT

THIS ASSIGNMENT, made this ___24th___ day of ___February___ ,2004

_Y_ ___Software of the Month Club, Inc. / SOMC Group, Inc.___

of (address) ___1935 Camino Vida Roble___

in the City of ___Carlsbad , 92008-6513___ , County of ___San Diego___

State of California, part ____ of the first part, hereinafter referred to as assignor, to SAN DIEGO CREDIT ASSOCIATION, a California corporation, of San Diego, California, party of the second part, hereinafter referred to as assignee

WITNESSETH: That said assignor, for and in consideration of the covenants and agreements to be performed by the party of the second part, as hereinafter contained, and of the sum of One Dollar ($1.00) to assignor in hand paid by said assignee, receipt whereof is hereby acknowledged, does by these presents grant, bargain, sell, assign, convey and transfer unto said assignee, its successors and assigns, in trust, for the benefit of assignor's creditors generally, all of the property of the assignor of every kind and nature and wheresoever situated, both real and personal, and any interest or equity therein not exempt from execution, including, but not limited to, all that certain stock of merchandise, store furniture and fixtures, book accounts, books, bills receivable, cash on hand, cash in bank, deposits, patents, copyrights, trademarks and trade names, insurance policies, choses in action that are legally assignable, together with the proceeds of any existing non-assignable choses in action that may hereafter be recovered or received by the assignor.

This assignment specifically includes and covers all claims for refund or abatement of all excess taxes heretofore or hereafter assessed against or collected from the assignor by the U.S. Treasury Department, and the assignor agrees to sign and execute power of attorney or all other documents as required to enable said assignee to file and prosecute, compromise and/or settle, all such claims before the Internal Revenue Service, U.S. Treasury Department.

Leases and leasehold interests in real estate, contracts or agreements between assignor and any Labor Union, or Trade ociations, are exempted from and not included in this assignment.

This assignment does not include any alcoholic beverages, but the assignor hereby appoints assignee as his agent for the sole purpose of filing an application for a permit and the selling of the alcoholic beverages in the said place of business (said assignee being vested tich absolute discretion in regard thereto and assuming no liability by reason thereof), and assignor hereby assigns to assignee all of the proceeds of such sale for the benefit of his creditors generally in accordance with the terms of this assignment. This assignment includes all licenses for the sale of alcoholic beverages.

The assignor authorizes the forwarding of his or its mail by the U.S. Postal Department as directed by the Assignee.

Said assignee is to receive the said property, conduct the said business, should it deem it proper, and is hereby authorized at any time after the signing hereof by the assignor to sell and dispose of the said property upon such time and terms as it may see fit, and is to pay to creditors of the first party pro rata, according to the several indebtedness due to them from the said assignor, the net proceeds arising from the conducting of said business and sale and disposal of said property, after deducting all moneys which said assignee may at its option pay for the discharge of any lien on any of said property and any indebtedness which under the law is entitled to priority of payment, and all expenses, including a reasonable fee to assignee and its attorney and to attorney for assignor.

If any dividends to creditors shall remain unclaimed for a period of two years after issuance of the final dividend checks, then the same shall become the property of the assignee and used to supplement its fees for services rendered in administering this assignment. Any interest that may be earned on funds administered under this assignment shall belong to and are hereby assigned to the assignee as additional fees for its services hereunder.

Said assignee is also authorized and empowered to appoint such agents, field representatives and/or attorneys and/or accountants as it may deem necessary, and such agents and/or field representatives shall have full power and authority to open bank a_ ounts in the name of the assignee or its nominees or agents and to deposit assigned assets or the proceeds thereof in such bank nts and to draw checks thereon and with the further power and authority to do such other acts and to execute such papers and _ uments in connection with this assignment as said assignee may consider necessary or advisable

IN WITNESS WHEREOF the said parties hereunto set their hands the day and year first above written

ASSIGNOR'S TAX I.D. NUMBERS:
Internal Revenue Service

# _____

# _____

State Board of Equalization

# _____

Employment Development Department

# _____

Software of the Month Club
SOMC Group, Inc.

Tom Holland, President

_____ Donna B. Pollock, Secretary

SAN DIEGO CREDIT ASSOCIATION

By _____
Party of the Second Part
Gregory M. Garner, President

Tab 3

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Agreement") is made and effective as of February 24, 2004 by and among San Diego Wholesale Credit Association, a California corporation ("SDWCA"), solely in its capacity as assignee for the benefit of creditors of SOMC Group Inc., a California corporation ("SOMC"), and Logetics, Inc., a California corporation ("Buyer"), with respect to the following facts:

A.      SOMC owned and operated a business which provided name-brand software.

B.      On February 24, 2004, SOMC made a general assignment of its assets to SDWCA, as assignee for the benefit of creditors (the "Assignment").

C.      Buyer desires to acquire certain assets of SOMC on the terms and conditions set forth herein.

IN CONSIDERATION OF the premises and mutual covenants contained in this Agreement, and for good and valuable consideration, the parties agree as follows:

1.      **Purchase and Sale of Assets**. On the Closing Date (as hereinafter defined), SDWCA will transfer to Buyer, and Buyer will purchase from SDWCA, the assets of SOMC (to the extent assigned to SDWCA pursuant to the Assignment) that are set forth on Exhibit "A" attached hereto (collectively referred to herein as the "Assets"). Notwithstanding the foregoing, the Assets shall not include the excluded assets set forth in Exhibit "B" attached hereto (the "Excluded Assets"). To the extent the Assets include books and records (whether in electronic, hard copy or any other form), Buyer shall retain copies of all such books and records or the originals thereof as may be reasonably necessary to wind up the affairs of SOMC or relating thereto; and Buyer agrees to provide reasonable access to SOMC and SDWCA to such books and records as may be necessary to wind-up the affairs of SOMC or relating thereto. Without limiting the foregoing, SDWCA and/or SOMC may also retain copies of all such books and records as may be reasonably necessary for such winding up activities. Buyer hereby grants to each of SOMC and SDWCA a perpetual, non-exclusive, royalty free license to use the "SOMC," "Software of the Month Club™," "Jellybean Islands™," Ready Set Grow™" and "TechLine Help™" names and related names and the Assets in connection with winding up the affairs of SOMC and the Assignment.

2.      **Purchase Price**. The purchase price of the Assets shall be Forty-Six Thousand Two Hundred Dollars ($46,200.00), payable by Buyer at the Closing as follows:

2.1     **Cash Consideration**. Buyer shall pay SDWCA the sum of Forty-Six Thousand Two Hundred Dollars ($46,200.00) at the Closing by cashier's check or by wire transfer.

2.2     **Sales Tax Payable by Buyer**. Buyer shall pay the sales tax due with respect to the transactions contemplated hereby. At the Closing, Buyer shall deliver to SDWCA the sum of the sales tax payable by it under this Agreement, and SDWCA shall make such sales tax payment as required.

2.3     **Assumption of Liabilities**. Effective as of the Closing, Buyer hereby assumes and agrees (and shall be deemed to have assumed and agreed) to perform all obligations of SOMC (and SDWCA (if any)), whether under license agreements, contracts or otherwise, to destroy any compact disks and/or CD-ROM software or programs (collectively, the "Titles") transferred to Buyer by SDWCA which are no longer authorized for sale or distribution and to provide to the applicable publishers (the "Publishers") Certificates of Destruction or similar documents as required by such Publishers evidencing and/or certifying such

destruction. Except as expressly provided in this Agreement or any document executed in connection herewith, Buyer is not assuming any liabilities of SOMC or SDWCA.

### 3.    No Representations; Indemnity.

      **3.1**    BUYER AGREES TO ACQUIRE THE ASSETS FROM SDWCA "AS IS" AND "WHERE IS", AND ACKNOWLEDGES THAT SDWCA MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER WITH RESPECT TO THE ASSETS OR LIABILITIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY REPRESENTATION OR WARRANTY REGARDING TITLE TO OR CONDITION OF THE ASSETS, OR THE FITNESS, DESIRABILITY, OR MERCHANTABILITY THEREOF OR SUITABILITY THEREOF FOR ANY PARTICULAR PURPOSE, OR THE EXISTENCE OR AMOUNT OF ACCOUNTS, LIABILITIES, LIENS, CLAIMS OR ENCUMBRANCES. BUYER FURTHER ACKNOWLEDGES AND REPRESENTS THAT IT HAS REVIEWED AND INSPECTED THE ASSETS, HAS HAD THE OPPORTUNITY TO INSPECT THE BOOKS AND RECORDS OF SOMC AND THE PUBLIC FILING RECORDS AND ENTERS INTO THIS AGREEMENT AFTER INDEPENDENT INVESTIGATION OF THE FACTS AND CIRCUMSTANCES RELATING TO THE ASSETS, THE FINANCIAL CONDITION OF SOMC AND THE TRANSACTION DESCRIBED HEREIN. BUYER FURTHER ACKNOWLEDGES THAT SDWCA DOES NOT HAVE POSSESSION OF THE ASSETS, AND THAT BUYER WILL HAVE SOLE RESPONSIBILITY TO OBTAIN POSSESSION OF THE ASSETS, AT ITS SOLE EXPENSE. BUYER AGREES THAT SDWCA HAS NO OBLIGATION OR LIABILITY WHATSOEVER WITH RESPECT TO ANY SEPARATE AGREEMENTS, INDEMNITIES, REPRESENTATIONS OR WARRANTIES ENTERED INTO BY BUYER AND/OR SOMC.

      **3.2**    Without limiting the provisions of **Section 3.1** or any other provision of this Agreement, Buyer acknowledges that the sale and/or other distribution of the Titles are subject to license agreements which are not being transferred to Buyer by SDWCA, that Buyer shall not be entitled to sell or distribute such Titles without appropriate licenses and that Buyer assumes responsibility for obtaining all required licenses, other agreements and permits as may be required so that Buyer may lawfully sell and/or distribute the Titles. Buyer further acknowledges that the Publishers may from time to time revoke authorization to sell and/or distribute Titles or portions thereof and require the provision of Certificates of Destruction or similar documentation evidencing destruction of such Titles.

      **3.3**    Buyer hereby agrees to indemnify, defend and hold SDWCA and its agents, employees, directors, officers, shareholders, affiliates, attorneys, consultants, independent contractors, successors and assigns (collectively "Indemnitees") harmless from and against any and all liabilities, demands, claims, actions or causes of action, assessments, losses, costs, damages or penalties or expenses, including attorneys' fees, imposed on, accrued against, asserted against, sustained or incurred by Indemnitees, directly or indirectly, resulting from, arising out of or by virtue of: (a) any liability of Buyer arising on or after the Closing Date, whether or not related to the ownership or use of the Assets; (b) breach of any representation, warranty, covenant or agreement of Buyer contained herein or in any agreement executed in connection herewith; and (c) the ownership, sale, disposition or use of the Assets prior to the Closing Date and from and after the Closing Date.

### 4.    Conditions to Closing-SDWCA.
SDWCA's obligation to transfer the Assets to Buyer shall be subject to fulfillment of the following conditions on or before the Closing Date:

      **4.1**    **Receipt by SDWCA of Buyer's Deliveries**. SDWCA shall have received the deliveries required under **Sections 6.1, 6.2** and **6.4** of this Agreement.

San Diego Wholesale Credit Association/SOMC      2
Asset Purchase Agreement
SD\45608.2                                          2/24/04

**4.2    Matters Satisfactory to SDWCA and Its Counsel.** All matters incident to the transactions contemplated hereby shall be in form and substance satisfactory to SDWCA and its counsel.

**4.3    No Legal Proceedings.** No action, suit or proceeding shall have been commenced before any court to restrain or prevent the carrying out of the transactions contemplated by this Agreement.

**4.4    Consents of Secured Creditors; UCC Terminations.** SDWCA shall have obtained the written consent of all secured creditors of SOMC to the sale to Buyer and/or assumptions of obligations of such persons or entities, or SDWCA shall have received UCC Termination Statements releasing the Assets from the UCC Financing Statements filed against SOMC, unless such requirements are waived by SDWCA.

**5.    Condition to Closing-Buyer.** Buyer's obligations to purchase the Assets and pay the Purchase Price shall be subject to fulfillment of the following conditions on or before the Closing Date:

**5.1    Receipt by Buyer of SDWCA's Deliveries.** Buyer shall have received at the Closing the deliveries due it under **Section 6.3** of this Agreement.

**5.2    Matters Satisfactory to Buyer and Its Counsel.** All matters incident to the transactions contemplated hereby shall be in form and substance satisfactory to Buyer and its counsel.

**6.    Deliveries at Closing.** The parties shall make the following deliveries at Closing:

**6.1    Cashier's Check - Purchase Price.** Buyer shall deliver to SDWCA a cashier's check or deliver funds via wire transfer to the account of SDWCA in the amount of Forty-Six Thousand Two Hundred Dollars ($46,200.00).

**6.2    Cashier's Check - Sales Tax.** Buyer shall deliver to SDWCA a cashier's check or deliver funds via wire transfer to the account of SDWCA in the amount of Eight Hundred Fifty-Two Dollars and Fifty Cents ($852.50) representing sales tax on the portion of the purchase price allocable to furniture, fixtures and equipment.

**6.3    Bill of Sale.** SDWCA shall deliver to Buyer a Bill of Sale in form and substance reasonably satisfactory to Buyer.

**6.4    Corporate Documents.** As required by SDWCA, Buyer shall deliver to SDWCA a certified copy of its resolution authorizing the purchase of the Assets and an incumbency certificate and such other corporate related documents as SDWCA shall reasonably request.

**7.    Closing.** The closing (the "Closing") shall occur at 2:00 p.m. on February 24, 2004 at the offices of Duane Morris LLP, 101 W. Broadway, Suite 900, San Diego, California 92101, or at such later time as the parties may mutually agree (the "Closing Date").

**8.    Miscellaneous.**

**8.1    Entire Agreement.** This Agreement and the written agreements referred to herein and executed in connection herewith constitute the entire understanding among the parties with respect to the subject matter hereof, and supersede all negotiations, prior discussions or other agreements, oral or written.

**8.2    Governing Law; Venue.** This Agreement shall be governed by and construed in accordance with the laws of State of California, without reference or regard to the principles of conflict of

laws. Any action arising out of this Agreement may be brought and maintained in the Federal District Court for the Southern District of California or the California state courts located in San Diego County, and the parties hereto consent to the jurisdiction of such courts.

**8.3    Counterparts.** This Agreement may be executed in counterparts. Duly acknowledged facsimile signatures shall be deemed as originals.

**8.4    Fees and Costs.** If any action, including any arbitration proceeding, is instituted to enforce the terms or provisions of this Agreement, including an action instituted after the bankruptcy of a party, the prevailing party in such action shall be entitled to collect as part of its recovery all reasonable costs, charges and fees, including but not limited to its expert witness fees and attorneys' fees and costs, incurred in connection with such action.

**8.5    Amendment.** This Agreement may only be amended or modified by the written agreement of the parties.

**8.6    Severability.** If any of the provisions of this Agreement are held invalid under any law, such invalidity shall not affect the remainder of the Agreement.

**8.7    No Assignment.** Neither this Agreement nor any rights or obligations hereunder shall be assigned by any party without the prior written consent of the other parties hereto.

**8.8    Further Assurances.** Each party agrees to perform any further action and to execute and deliver any further documents reasonably necessary or proper to carry out the intent of this Agreement.

**8.9    Successors and Assigns.** Subject to **Section 8.7**, this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties.

**8.10    Headings.** The headings of the various sections of this Agreement are for convenience only and are not intended to explain or modify any of the provisions of this Agreement.

**8.11    Notices.** All notices to be given by any party to this Agreement to the other party shall be in writing, and shall be given by certified or registered United States mail, return receipt requested, postage prepaid, to the other, sent by telefax or facsimile transmission, or personally delivered, at the addresses set forth below (or at such other address for a party has specified by like notice) and shall be deemed given when received if sent by facsimile transmission or personally delivered, or if mailed as provided herein, on the second day after it is so placed in the mail.

The addresses referred to above are:

Buyer:                        Logetics, Inc.
                              1935 Camino Vida Roble
                              Carlsbad, California  92008
                              Attention:  Thomas E. Holland, President
                              Phone:  760-827-7378
                              Fax:     760-827-4202

San Diego Wholesale
Credit Association:

San Diego Wholesale Credit Association
2044 First Avenue, Suite 300
San Diego, California 92101
Attention: Greg Garner, President
Phone: (619) 239-8191
Fax:    (619) 239-6301

Any party at any time may give notice of another address in accordance with the provisions of this Section 8.11.

**8.12    Representations and Warranties**. Each party signing this Agreement represents and warrants that it has the legal authority to enter into this Agreement and agreements executed in connection herewith and bind the entity upon whose behalf it signs. Buyer further represents and warrants that it has a valid seller's re-sale license in California, covering the tangible Assets, Resale License No. 100-342314.

**8.13    Survival of Obligations**. All obligations of the parties set forth in this Agreement shall survive the Closing and Closing Date.

**8.14    Effect of Course of Dealing**. No course of dealing between the parties in exercising any of their respective rights under this Agreement shall operate as a waiver of any such rights, except where expressly waived in writing.

**8.15    Limitation on Liability**. Notwithstanding any other provision herein to the contrary, the liability of SDWCA hereunder, if any, shall be nonrecourse, and SDWCA shall have no liability to Buyer hereunder.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be fully executed as of the day and year first above written.

**SAN DIEGO WHOLESALE CREDIT ASSOCIATION**, a California corporation

By: _____
Greg Garner
Its: President

**LOGETICS, INC.**, a California corporation

By: _____
Thomas E. Holland
Its: President

## EXHIBIT "A"

### ASSETS TO BE INCLUDED

All of SDWCA's right, title and interest as assignee for the benefit of creditors of SOMC Group Inc. in and to the following assets ("Assets"):

A.    Furniture, fixtures and equipment (collectively, "FFE") as follows:

    1.    Approximately 18 Office Lots -- each Office Lot includes desk, desk chair, visitor chairs, credenza, bookcase, file cabinet, and miscellaneous desk accessories, pictures and/or plants.

    2.    Approximately 18 PC Computer Lots -- each PC Computer Lot includes personal PC, keyboard, monitor, mouse and printer.

    3.    1 Corporate Computer lot -- includes approximately 4 - 5 computer servers with databases for customer development, marketing, network, mail, backup, tape drive, racks, router, switch and firewall.

    4.    1 Miscellaneous Lot -- includes miscellaneous work tables, file cabinet, refrigerator, microwave, office supplies, copier, color printer, fax machines, lobby chairs, dry erase board, and small conference table with chairs.

Prior to or contemporaneously with Closing, Buyer and SDWCA shall identify the specific items of FFE included as part of the Assets.

B.    Approximately 425,000 CD-ROM units, and associated marketing and packaging materials

C.    Software of the Month Club™, Jelly Bean Islands™ and Ready Set Grow™ names; websites, domain name and URL; trademarks, logos, stock photography, artwork and fonts (including the Bright Ideas collection); computer files, databases and related materials related to product design, marketing, production, distribution and customer billing and sales; customer support tools, including TechLine Help™; and telephone number.

D.    SOMC customer and membership names and lists

Notwithstanding the foregoing, the Assets shall not include any of the Excluded Assets set forth and described in the Agreement and/or Exhibit "B" thereto.

### EXHIBIT "B"

## ASSETS TO BE EXCLUDED

Notwithstanding the other provisions of the Agreement, the Assets shall not include the following assets owned by SOMC or SDWCA as assignee thereof or in which either of them has or had any interest (the "Excluded Assets"):  (a) any asset excluded from transfer under **Section 1** of the Agreement; (b) any assets not set forth on Exhibit "A" to the Agreement; (c) tax attributes, including, but not limited to net operating loss carryovers; (d) tax refunds; (e) any property owned by third parties, whether under a lease or otherwise; (f) workers' compensation refunds; (g) license agreements and/or rights; (h) accounts or accounts receivable; (i) utility or security deposits; (j) cash, deposit accounts, certificates of deposits or other cash equivalents; (k) the corporate minute book; (l) any stock, partnership, membership or other equity interest in any other entity; (m) leases and any property covered thereby; (n) insurance policies; (o) assets which are otherwise not assignable; (p) causes of action or claims (including, but not limited to, any causes of action or claims relating to preferential or fraudulent transfers) that SDWCA would be entitled to bring as an assignee for the benefit of creditors or use as an offset or defense to any claim; (q) any real property interests, including leases of real property; (r) any assets not transferred to SDWCA by SOMC; and (s) personnel and accounting records (in any form, whether in hard copies, electronic files or otherwise).